ANNIBELLE JACKSON and HENRY N. JACKSON v. JESSIE PARKER and GLADYS PARKER McFARLAN, joined by her husband, ARTHUR McFARLAN.

15 So. (2nd) 451          June Term, 1943
October 29, 1943          Division B

*Frank R. Greene,* for appellants.

*L. W. Duval,* for appellees.

BROWN, J.:

This is an appeal by the defendants below from a decree foreclosing a certain mortgage on a house and lot in Ocala, Florida, in a suit brought by appellees, non-resident collateral

heirs at law of Mrs. Gladys P. Monroe, who at her death was the surviving mortgagee. The evidence was taken before an examiner, who took all the evidence submitted by the parties, recording all objections made by the respective counsel, and the chancellor ruled upon such objections when the case was finally submitted upon pleadings and proof.

In the year 1930, the appellant, Annibelle Jackson and her husband Henry N. Jackson, were living in a residence in Ocala which they had been renting for some years from the owners, George F. Monroe and wife Gladys P. Monroe. The Monroes were elderly people who had no children or near relatives. They had become close friends of the appellants and were quite devoted to their little six year old daughter. In December of that year, while the Monroes were on a visit to the appellants in their home, they suggested selling the property to the appellants on the basis of monthly payments of $37.50 per month to be continued so long as either of the Monroes should live or until a total price of $4500.00 had been paid, and that upon the death of the survivor of the Monroes, if that happened before the mortgage was paid off they would leave a release of the mortgage which would be mailed to the Jacksons. The appellants finally accepted the proposal, on the terms offered, though Mrs. Jackson thought $4500.00 was more than the cash value, and Mrs. Monroe a few days later mailed to them from Apopka, where the Monroes lived, a mortgage which she had drawn in her own hand writing upon a regular printed form, together with a deed of the property to the appellants, also drawn by Mrs. Monroe and executed by herself and husband, with the request that they sign and attest the mortgage and have both recorded. Both the deed and the mortgage recited a consideration of $10.00 and other valuable considerations, and in the defeasance clause of the mortgage the following appears:

"Provided always, that if said mortgagors, their heirs, legal representatives or assigns, shall pay the said mortgagees, their legal representatives or assigns, a certain promissory note, a copy of which is on the reverse side hereof and shall conform and comply with each and every stipulation, agreement and covenant of said note and of this

mortgage, then this mortgage and the estate hereby created shall be void, otherwise the same shall remain in full force and virtue."

On the reverse side of the mortgage under the words "Copy of Note" there appeared a form of note, which had been written by Mrs. Monroe and which was undated and had blank spaces for two signatures, the body of which read as follows:

"$4,500.00

"After date, for value received, we promise to pay George F. Monroe and Gladys P. Monroe, or order, Four Thousand Five Hundred and 00/100 _____Dollars, without interest, same being payable monthly sum of $37.50 each month, both principal payable at any bank in Ocala, Florida. This note secured by mortgage on real estate of even date herewith, and is subject to all the terms and covenants therein contained."

Mr. and Mrs. Jackson signed the mortgage and acknowledged the same before a notary public on December 20, 1930, and on that same day filed both the deed and the mortgage for record. Thus neither the date nor the names of the makers of the note were filled in when the mortgage was executed and recorded by the appellants. Indeed we think it is clearly deducible from all the evidence that Mrs. Monroe, when she forwarded the deed and mortgage to the Jacksons, did not enclose a form of an original note for them to sign. After the execution and recording of the mortgage, when same was returned to them by the clerk, appellants discovered that the note form under the words "Copy of Note," on the back of the mortgage had not been filled in, and Mrs. Jackson inserted the date, being the date of execution of the mortgage, December 20, 1930, and each of them signed said note form on the back of the mortgage and forwarded the mortgage to Mrs. Monroe without having the same rerecorded. So there was no executed note in existence when the mortgage was recorded.

These were all good people, and it appears to us, after reading this record, and the perfectly frank and unvarnished testimony of the witnesses for both sides, that both the

mortgagors and the mortgagees were trying to be absolutely fair and above-board with each other. Mr. and Mrs. Jackson freely admitted signing this note form on the back of the mortgage, which they had never denied, and stated that it was the only note or note form which they had signed. The language of the mortgage contemplated that it was security for a certain promissory note, "a copy of which" was alleged to be on the reverse side thereof. Counsel for appellants contend here, as they did in the court below, that the mortgage was given to secure an original promissory note, not a copy of a note, and that the form of the note on the back of the mortgage which the appellants signed was not an original note. The question at once arises, if it was a mere copy, and so intended, why did they both sign it, or sign it at all?

However, Mr. and Mrs. Jackson testified that they each voluntarily signed this form of note on the back of the mortgage, and that it was the only one they did sign. They did not testify as to what their intention was, if indeed they could have legally done so. Furthermore, the execution of the mortgage and note was consistent with the oral understanding which they had with the Monroes, if that can be considered, which we will discuss later. In view of all these circumstances the court below held, and we think correctly so, that this note which the appellants signed was in effect and should be considered as an original note. In this general connection, see 32 C.J.S. 748 et seq; 36 Am. Jur. 717-718; Ronnoc Grove Co. v. Coe-Mortimer Co. 83 Fla. 370, 91 So. 265. The chancellor observed in his opinion that as this was a purchase money order, it could have been foreclosed for the purchase price even had there been no note. Perhaps so if the purchase price was otherwise proven. But aside from the note, there was no evidence of the amount of the purchase price save the testimony as to the verbal understanding between the parties. Technically, the mortgage was delivered when it was filed for record, but appellants could not take advantage of the fact that the note was signed after the recording. The mortgage was filed for record and recorded on December 20, 1930. They both voluntarily signed the note a day or two later and returned the mortgage to

Mrs. Monroe without mentioning the fact that the note had been signed after the mortgage was recorded, and Mr. and Mrs. Monroe received the mortgage and accepted it believing it to have been properly executed, as it appeared to have been on its face, and the Jacksons ratified the instrument, including the note, by making payments in accordance therewith for some years and until Mr. and Mrs. Monroe had passed away. The instrument, while constructively delivered when filed for record, was not *actually* delivered to Mrs. Monroe until after the note had been signed. Under these circumstances, no rights or third parties being involved, we are of the opinion that the note thus signed should be deemed and held to have been an original note or its legal equivalent. It might have been appropriate for the appellees to have sought a reformation of the mortgage instrument, in their bill to foreclose same, alleging the above facts and praying the court to strike the words "Copy of Note" where they appeared above the note which was signed by the mortgagors, but we do not consider that such procedure was imperatively required.

Some months later, on April 24, 1931, the Monroes executed and acknowledged in due and legal form a full release, satisfaction and discharge of the said mortgage, and this instrument was found, along with the mortgage, among the private papers of Mrs. Monroe. Mr. Talton, who was the administrator of Mrs. Monroe's estate, her husband having died first, opened her safety deposit box in his bank after her death and found the mortgage in question, but he did not find any note in connection with it other than the signed form which appeared on the back of it. However, he also found, in addition to the mortgage, the release and satisfaction of the mortgage above referred to. He also found a record made by Mrs. Monroe of the payments made by the Jacksons on said mortgage, which showed that the appellants made payments to the Monroes at the rate of $37.50 per month until October, 1932, when the payments, "on account of the hard times," as Mrs. Monroe noted in her record, were reduced to $30.00 per month, and in January, 1943, they were again reduced to $25.00 per month, and such payments were kept up

at that rate by the appellants until they learned of Mrs. Monroe's death, when they ceased making payments and stopped payment on checks sent out in ignorance of her death. In their answer, appellants offered to pay the amount of such reductions with interest, so as to fully comply with the original understanding that the installments would be $37.50 per month until the death of both the Monroes.

Mrs. Monroe's estate was administered in Orange County. She left an unwitnessed will, which was refused probate, and her estate passed by inheritance to her collateral kin, the two appellees in this case. No steps were taken by the administrator to enforce this mortgage, and after winding up the estate, he turned it over to the appellees who thereafter filed this suit.

Both Mr. and Mrs. Jackson testified that a few days before the executed deed and mortgage form were received by them by mail from the Monroes, in December 1930, Mr. and Mrs. Monroe, while visiting them in their home in Ocala, made them a proposition to sell and convey the place to them upon the terms above indicated, the installments of $37.50 per month without interest to be paid until the purchase price of $4500.00, to be secured by mortgage, was all paid, unless before the $4500.00 was fully paid the Monroes should both die, in which event all further payments should cease, and that the Monroes would leave a paper releasing or canceling the purchase money mortgage, which paper would be mailed to the Jacksons upon the death of the Monroes. The chancellor below held, as he was compelled to do by the ancient statute, Section 4372 C.G.L., 90.05 Florida Statutes 1941, that this testimony was incompetent and inadmissible.

We might note in passing that the provisions of this statute are entirely eliminated by the Model Code of Evidence adopted last year by the American Law Institute. In this book there is incorporated a valuable commentary by Mr. Mason Ladd on the changes wrought by this code. As to exclusion statutes of this nature, Mr. Ladd, among other things, says:

"In every jurisdiction where the statute now exists, there is a wide range of hairsplitting distinctions opening the

avenue for the survivor to testify. The most common of these is overheard statements rather than direct communications. If disposed to falsify, the survivor may make out a case sufficient to sustain a decision in spite of these statutes. The honest claimant suffers by being denied the right to testify to personal communications and transactions. The honest rights of the living are sacrificed in a vain effort to protect a dead man's estate from false claims. The model code of evidence, in accordance with the practice of a number of states, eliminates altogether this last historical relic of a disqualification because of interest."

But until the Legislature sees fit to repeal or modify the rigors of this statute, the courts must enforce it, and should not attempt to get around it by any "hair-splitting distinctions," which do not really distinguish. So we hold that the chancellor was justified in excluding from consideration that part of the testimony of the appellants relating to "any transaction or communication" between them and the deceased mortgagees with reference to this deed and mortgage. However, there is one fact testified to by Mr. Jackson which was admissible and which was not denied. He testified that after Mrs. Monroe's death, he went to see Mr. Talton, the administrator, and asked him if he found among Mrs. Monroe's papers a release of this mortgage and he replied that he had found such a release and showed it to Mr. Jackson. It was duly signed and acknowledged by both the Monroes on April 24, 1931. Mr. Jackson requested Mr. Talton to deliver it to him, but he declined, saying that all Mrs. Monroe's papers were "the property of the court." A copy of this release and satisfaction is in this record. It correctly describes and identifies the mortgage.

Fortunately for the appellants there is in this record the testimony of other witnesses who testified to practically the same material facts as those shown by the excluded testimony of Mr. and Mrs. Jackson.

Mr. Julian H. Michels, of Ocala, testified that he knew the Monroes in their life time, and had a conversation with them at the home of the Jacksons "right after" they, the Monroes, had sold the place to the Jacksons, who were

present during the conversation. The Monroes offered to sell witness another house and lot that they owned in Ocala, for a stated sum $4500.00, payable monthly without interest until they died; then he said there was to be "a paper, or in the will, I forget which, a release given me requiring no further payments" after their deaths. That the Monroes stated that the proposition made him was "just like the terms we made the Jacksons;" that the monthly payments were to be made until the $4500.00 had been paid, but that if they died before that the payments were to cease. Mr. Michels said that he was not able to accept the proposition at that time on account of his financial condition and his wife's long illness. He did buy some six months later, but on different terms. Mrs. Michels, who was present at the conversation testified to by her husband also testified to substantially the same thing. She did add this: that the reason the Monroes gave for making the offer was that they wanted an income as long as they lived, and that as there was no one they wanted to leave anything to, they would leave to them,—the Michels.

Mrs. Sterling Hooper, a long time resident of Ocala, gave similar testimony. That after visiting the Jacksons and selling them the property here involved, the Monroes visited witness in her home, as they always did when in Ocala, and told her about the sale to the Jacksons, and that Mrs. Monroe talked with witness in regard to selling her and her husband another place they owned in Ocala; that Mrs. Monroe said: "We are getting old and it is too much trouble to come up here. Why don't you and Mr. Hooper buy this property like we sold the Jacksons. You can buy it like rent and not pay any interest. We are both getting old and when we are gone, the property is yours." As to the payments, they were to be "like we sold the Jacksons." That she said that "after they were gone, the property would be there. If they lived, that we would have to pay for it." That she also said "when we are gone, the property will be yours;" that I would have to make the monthly payments only as long as they lived, and when they were gone that the property would be ours, and that there would be a deed in the bank." That Mrs. Monroe made the proposition and said "just like we sold the Jacksons."

Mrs. D. E. Monahan, of McIntosh, Florida, an old friend of the Jacksons, who was also acquainted with the Monroes, testified that she was also visiting the Jacksons when Mr. and Mrs. Monroe were there in December, 1930, and that the sale of the place to the Jacksons, which had been discussed the night before, was discussed in a general way in her presence at the breakfast table; that the Jacksons were to take the place on monthly payments; they were paying rent anyway; that the Monroes said that they would give them a contract for title or a deed to the place, and that when they were gone the Jacksons would find a paper in their private papers in the bank "cancelling this particular piece of property." Witness did not recall the price being mentioned, nor the amount of the monthly payments or how long they were to continue; that she discussed that later with the Jacksons; that she didn't see the mortgage; that after the proposition was made, Mr. Monroe laid his hand on Rose's head, and said "We are doing this for this little tot." That the Monroes were extremely fond of the child; and they also knew that witness was a close friend of the Jacksons.

Appellees do not question the credibility of these witnesses or the truthfulness of their testimony. Their contention is that the testimony was legally irrelevant and inadmissible.

We recognize the general rule (to which there are some well settled exceptions) to the effect that parol testimony as to the existence of a contemporaneous or collateral verbal agreement is not admissible to vary or contradict the terms of a valid written instrument. Anderson v. Ax. 104 Fla. 294, 139 So. 798, and cases cited; see also 32 C.J.S. 834 et seq. But this case, as well as we shall presently show, is governed by another and different, though equally well settled, principle.

Earlier in this opinion, we reached the conclusion that, in spite of the fact that the note on the back of the mortgage signed by both the Jacksons were entitled "Copy of Note," and in spite of the fact that the mortgage recited that "a copy of the note" secured thereby appeared on the reverse side thereof, the note should be held to be an original note

because the aceptance of the deed created an obligation to pay the purchase price, whatever that was, and the Jacksons frankly admitted in their testimony that the note correctly stated the total purchase price and the amounts of the monthly installments which they had verbally agreed on with the Monroes and that each of them had actually signed it before mailing it to the Monroes. But, as hereinabove observed, aside from the note itself, signed by the Jacksons, but which was entitled "Copy of Note," and also referred to in the mortgage as a copy of note, there was no evidence of the amount of the purchase price offered by the plaintiffs below, appellees here, save the admissions of Mr. and Mrs. Jackson on cross examination that they each signed the note, and that it correctly stated the purchase price, as far as it went, which had been heretofore agreed on between them and the Monroes.

But the chancellor below properly held that the testimony of Mr. and Mrs. Jackson as to any transaction or communications between them and the Monroes was incompetent and inadmissible, thereby properly also holding that the statutory rule was not waived by the questions put and answers elicited by the plaintiffs on cross-examination as to the existence and amount of the indebtedness and the terms of the purchase. As the testimony was taken before an examiner, the chancellor did not get a chance to rule on it until it was all taken. The testimony of the Jacksons above referred to was properly objected to in the beginning by plaintiffs. So the chancellor's ruling was correct. The testimony of Mr. and Mrs. Jackson as to the understanding between them and the Monroes with reference to the amount of the purchase price and how it was to be paid and the other terms and conditions of the purchase and sale which the Monroes offered and which they agreed to accept, cannot be considered, no matter how true.

Fortunately for Mr. and Mrs. Jackson, they were able to adequately prove by disinterested and unimpeached witnesses the terms on which they had purchased the property, from Mr. and Mrs. Monroe. We refer to the testimony of Mr. and Mrs. Michels as to the statements made to them by the Monroes right after the Monroes had sold to the Jacksons,

as to the terms of such sale, which conversation took place in the presence of the Jacksons, and which showed that they offered to sell another place to the Michels at exactly the same price and on the same terms. We also refer to the testimony of Mrs. Hooper, to whom a similar proposition was made while the Monroes were still visiting in Ocala, though this witness did not name the purchase price mentioned. However, her testimony strongly supports that of the Michels. We refer also to the testimony of Mrs. Monahan, who heard a significant part of the conversation between the Monroes and the Jacksons, and which, as far as it went, also supported the testimony of Mr. and Mrs. Michels.

A reference to the summary of this testimony, hereinabove set forth, not only explains and supports the deed and mortgage and note, but it also explains and makes valid and effective as to the date of the death of Mrs. Monroe the release and satisfaction of the mortgage, which release the Monroes executed some three or four months after the mortgage was received and which was placed along with the mortgage in Mrs. Monroe's lock-box at the bank in Apopka, and which should have been delivered to them when Mr. Jackson called for it after Mrs. Monroe's death. When this release and satisfaction was executed and acknowledged, the mortgage installments had nearly ten years to run. Why should the Monroes have executed this carefully drawn release at that time if there had not been an agreement between them and the Jacksons such as that which was admitted by the Monroes to have been made in their conversation with the Michels almost immediately afterward, and the nature of which agreement was testified to by Mrs. Hooper and Mrs. Monahan?

It is perfectly plain to us that the deed, the note and mortgage, and the release, were all executed pursuant to the parol understanding and agreement entered into by and between the Monroes and the Jacksons, and without which agreement none of these three instruments would ever have come into existence. The evidence shows that all four of these persons endeavored to carry out this agreement. The Monroes executed the deed and sent it along with the mort-

gage and "copy of note" to the Jacksons. The mortgage being incident to and dependent for its validity upon the existence of a debt which was to be evidenced by a note, the Jacksons endeavored to remedy Mrs. Monroe's oversight in not sending them an original note to sign by signing the "copy of note" which appeared on the reverse side of the mortgage, and thus they gave validity to the note and the mortgage, relying of course upon the Monroes to carry out their part of the agreement, to execute a valid release of the mortgage which the survivor of the two Monroes should arrange to have delivered to the Jacksons by mail after the death of such survivor. Undoubtedly, the Monroes intended to carry out their part of this agreement. They did execute the release and satisfaction with reasonable promptness and placed it in their box at the bank along with the mortgage and note, but perhaps due to old age and illness, the survivor, Mrs. Monroe, overlooked giving instructions to the bank to mail this release to the Jacksons upon her death. The president of the bank, who was appointed administrator of Mrs. Monroe's estate, when Mr. Jackson requested that the release be delivered to him, declined to do so. But equity considers that as done which ought to have been done, and in the light of the evidence in this case we hold that the release should be considered as having been delivered as of the date of Mrs. Monroe's death, and that the court below should give effect to it as of that date, upon compliance by the appellants with their offer to pay to appellees the amount of reductions of portions of the installments payments which Mrs. Monroe allowed them during the "hard times."

While these parties were close friends, we apprehend that the motive of the Monroes in offering to sell their several places in Ocala to their friends and tenants on the terms above testified to was not exclusively one of benevolence. It was a business transaction which was reasonable and fair to both sides. Doubtless what they had in mind, partly at least, was some enhancement of income during their declining years and relief from the bother and expense of paying taxes and insurance and keeping these places in good repair. We agree with counsel from both sides that we are not here dealing with any gift *inter vivos,* and none is shown.

It is easy to see where abstract justice lies in this case. The question is whether there is any applicable principles of law which will permit us to arrive at a just and equitable result.

Here we have four written instruments—a deed, a mortgage, a note, and a complete release and satisfaction of the mortgage and note. But the mortgage and note and the release were found in the lock-box of the mortgagee after her death in January, 1938, something over seven years after the deed and mortgage were executed. All three instruments were duly executed and valid on their face, except for the ambiguity in the mortgage note above referred to. Can the relation between these instruments be legally explained by parol testimony so as to give meaning and effect to all four? We think so.

We have already discussed the ambiguity in the mortgage and note which we considered to have been explained and cured by the parol testimony already discussed. The deed was valid on its face. There is no ambiguity in the deed, except as to the "other valuable considerations" referred to but not set out herein, if indeed that can be called an ambiguity, nor is there any ambiguity in the release and satisfaction of the mortgage; but why was the release executed long before most of the payments on the mortgage note fell due, and why was the release not actually delivered to the mortgagors immediately after it was executed, or at least while the mortgagees were still living? Surely the mortgagees had some object in view when they executed this release and acknowledged it before a notary public soon after the mortgage was made to them, though it then had nearly ten years to run, and then left the release along with the mortgage and note in their lock-box at their bank. When a person dies leaving in his lock-box a mortgage and also a release of that mortgage, there must be some explanation somewhere, if it can be found. What was the reason for leaving this release? All this is explained and the object and intention of the parties made clear by the parol testimony of the disinterested witnesses hereinabove reviewed. Was this testimony admissible? We hold that it was.

But the deed and the mortgage expressed a consideration of $10.00 "and other valuable considerations." The defeasance clause of the mortgage provided that the granting clause should be void if the mortgagors paid a promissory note, "a copy of which appears on the reverse side hereof." But this clause did not negative the existence of "other valuable considerations."

1. Where a deed recites a consideration of "one dollar and other valuable considerations" the statement as to considerations is not complete and the true consideration may be shown by parol. Herrin v. Abbe, 55 Fla. 769, 46 So. 183, citing Sullivan v. Lear, 23 Fla. 463, 2 So. 846, and other authorities. See also Brownson v. Hanna, 93 Fla. 223, 111 So. 731; 22 C. J. 1155-1163; 16 Am. Jur., 683, and Annotation in 25 L.R.A., N.S., 1194-2000. But testimony as to a parol agreement contrary to the grant made in the deed and tending to impair the rights of user incident to the estate granted is not admissible. Florida Moss Products Co. v. Leesburg, 93 Fla. 656, 112 So. 572. "Evidence of a parol contract carried out by executing a deed in furtherance of it does not offend against the rule forbidding alteration, addition of variation of a written contract by parol." St. Louis, etc., R. Co. v. Crandall, 75 Ark. 89, 86 W. 855. See also 9 Wigmore on Evidence, 3rd ed., Sec. 2433.

2. Practically the same rule as that above stated applies to mortgages. 36 Am. Jur. 747-9. While the express terms of the mortgage may not be contradicted by parol testimony, "the primary purpose of construction is to ascertain the intention of the parties. This is done not only from the face of the instrument, but also from the situation of the parties and the nature and object of their transactions." 36 Am. Jur. 747-748. It is well settled that under certain circumstances, a deed will be held in equity to constitute a mortgage; and we have held that parol evidence is admissible to show that a mortgage was intended to secure future advances; in addition to the amount that had actually been advanced when the mortgage was made. McEwan v. Growers Loan etc. Co., 104 Fla. 176, 139 So. 805. Where the contract, deed and mortgage appear to have been co-related parts of one general trans-

action, they may all be considered in arriving at the intention of the parties as to the release clause. Gardenia Estates v. Grove land, etc., Co., 104 Fla. 284, 289; 140 So. 787, 789; 22 C.J. 1156, et seq.

3. The testimony of the disinterested third parties may be admitted in evidence to prove relevant declarations or admissions made by a person since deceased, as against any person claiming under or in succession to such deceased person. Such testimony is not prohibited by the statute, 20 Am. Jur. 521 et seq., Sections 608-610; Withers v. Sandlin, 44 Fla. 253, 32 So. 829; 31 C.J.S., 1104-5, Sec. 327. See also 32 C.J.S. 435.

4. Where it appears that a particular element of an alleged extrinsic negotiation is not dealt with at all in the writing (as for instance in this case, the *time* when the release of mortgage was to be delivered or become effective) it is presumed that the writing or writings do not represent all of the transaction on that element, and parol evidence in proof of such element is admissible. Milton v. Burton, 79 Fla. 267, 84 So. 147; Wigmore on Evidence 3rd ed., Vol. 9, Section 2430; 32 C.J.S. 1027-1036; 22 C.J. 1145-46; 1148-51, 1155; 20 Am. Jur. 969. A particular mode of discharge agreed on by the parties may be proved by parol. 22 C.J. 1146; Waters v. So. Asphalt & Constr. Co., 67 Fla. 441; 65 So. 457. Parol evidence is admissible to connect several written instruments and show that they were all parts of one transaction. 20 Am. Jur. 955; Bailey v. Hannibal & St. J.R. Co., 17 Wall (U.S.) 96; 21 L. Ed. 611. And parol evidence is competent to show the conditions upon which a writing is to become effective as a contract. 20 Am. Jur. 955; and cases cited. See also in this general connection Stockton Mtge. Co., v. Nelson, 114 Fla. 600, 154 So. 333.

5. In the case of Mallard v. Ewing, 121 Fla. 654, 164 So. 674, this Court held that parol evidence is admissible to establish the true consideration of a written instrument, although it is different from the consideration expressed therein, provided it is not inconsistent therewith. In that case this Court also held, quoting from the opinion, that:

"It is also a generally recognized rule that parol evidence is admissible to establish a contemporaneous oral agreement which induced the execution of a written contract, though it may vary, change or reform the instrument. It is true that such rule requires the agreement to be shown by evidence that is clear, precise and indubitable; that is, it shall be found that the witnesses are credible, that they distinctly remember the facts to which they testify and that they narrate the details exactly and that their statements are true." (Citing authorities).

6. A solvent mortgagee has the right to release and cancel a mortgage and note made to and held by him at any time he sees fit to do so, even though the mortgage debt has not been fully paid, provided no rights of third parties have attached. No citation of authority is necessary to support that proposition. Nor can it be doubted that the mortgagor and mortgagee of a purchase money mortgage may lawfully agree, as a part of the consideration for the purchase and sale of the property involved, that a release and satisfaction of mortgage shall be executed, which shall be delivered or go into effect upon the happening of a future event, such as payment in full of the mortgage debt, or the death of the mortgagees before the installments on the mortgage debt have all become due and payable. See 22 C.J. 1156, wherein it is said that "Where an instrument, even though it is under seal, had been executed but not delivered absolutely, parol evidence is admissible to show the terms and conditions upon which it was, by the agreement and understanding of the parties, to be delivered, or that it was not to be delivered at all, until certain conditions should be performed. If, however, the condition itself was in writing, it cannot be varied by parol."

Applying these principles of law to the admissible evidence in this case,—which evidence shows what were the real considerations which prompted the execution, delivery and acceptance of the deed, mortgage and note, as well as the intent and purpose of the mortgagees in executing the release and satisfaction of the mortgage and leaving it, along with the mortgage, in their lock-box at the bank—our conclusion

is that all four of these instruments can be given force and effect and at the same time carry into effect the intention and agreement between the parties and the consideration underlying the same in pursuance of which these written instruments were all drawn and executed. The release and satisfaction of the mortgage, under the evidence in this case, should be deemed to have become effective as of the date of the death of the survivor of the two mortgages, i.e.; at the time of the death of Mrs. Monroe, and that the chancellor should direct the plaintiff below to deliver the same to the defendants below, appellants here, upon the payment by said defendants of the amount of the reductions from the monthly installments which were indulgently allowed by the Monroes for several years preceding the death of Mrs. Monroe, as well as the payment by said defendants of certain unpaid taxes on the property, all of which they have agreed and offered to pay in their answer.

Reversed and remanded for further proceedings consistent with the foregoing opinion.

BUFORD, C. J., THOMAS and SEBRING, JJ., concur.