In re Dale Frederick ALFORD, Jr. and Terri Ann Alford, Debtors.

Susan K. Woodard, Chapter 7 Trustee, Plaintiff,

v.

Synovus Bank of Tampa Bay and Dale F. Alford, Sr., Defendants.

Bankruptcy No. 8:05–bk–25425–ALP. Adversary No. 8:06–ap–00111–ALP.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

March 5, 2009.

Steven M. Berman, Shumaker, Loop & Kendrick, LLP, Tampa, FL, for Plaintiff.

Andrew T. Jenkins, Karen Cox, Bush Ross, PA, Tampa, FL, Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALEXANDER L. PASKAY, Bankruptcy Judge.

THIS PROCEEDING came on for a two-day trial on the Complaint to Avoid and Recover Preferential and Fraudulent Transfers (Doc. No. 1) ("Complaint") by the Chapter 7 Trustee, Susan K. Woodard ("Trustee") against Synovus Bank of Tampa Bay ("Synovus") and Dale F. Alford, Sr. ("Alford, Sr."). Default judgment having been entered against Alford, Sr. (Doc. No. 63), the Trustee proceeded at trial only against Synovus, and only on Count I of the Complaint, which was based on a theory of preferential transfer under 11 U.S.C. § 547 (2007).[1] Synovus also filed an Amended Counterclaim against the Trustee seeking the imposition of an equitable lien on the same property (Doc. No. 37).

At issue in this case is first whether Synovus was entitled, under its mortgage, executed by the joint debtor, Dale F. Alford, Jr., ("Debtor") to the full amount of what it received from the proceeds of the sale of an undeveloped parcel of land, 40 acres located in Hudson, Florida ("Hudson Property").[2] The Trustee asserts that the mortgage held by Synovus was limited to $100,000.00, based on explicit language on the face of the mortgage documents. Synovus was in total owed a larger amount by the Debtor, but if the *mortgage* were so limited, the additional $70,863.10 paid out of the sale proceeds to Synovus could be recovered as a preferential transfer. 11 U.S.C. § 547(b). The sale of the Hudson Property occurred on August 30, 2005. The Debtor's bankruptcy petition was filed on October 13, 2005.

The second issue in this case is whether, under an equitable lien theory, Synovus is still entitled to the full amount it received from the proceeds of the sale of the Hudson Property.

### Findings of Fact

According to the testimony of Alford, Sr., the Debtor's father, he originally purchased the Hudson Property for $80,000.00, paying $30,000.00 cash and executing a mortgage for the remaining $50,000.00. On February 12, 1993, Alford, Sr. transferred title to the Hudson Property, through a quitclaim deed, to himself and the Debtor as tenants in common (Pl.'s Ex. 1). Alford, Sr. testified that in exchange for the transfer of ownership, the Debtor agreed to pay off the remainder of the mortgage, which amounted to $50,000.00. (Trial Tr. vol. 3, 265:8–12.) He also testified that "[t]he property value at that time far exceeded $100,000.00, so this was a benefit to both he and I(sic)." (Trial Tr. vol. 3, 265:13–14.) He further testified that, at the time, he understood that he was giving his son a 50% interest in the property. (Trial Tr. vol. 3, 280:4–7.) The quitclaim deed is silent as to the division of ownership (Pl.'s Ex. 1). Alford, Sr.

---

1. All references to "section" or "§ " are citations within Title 11 of the United States Code unless otherwise specified.

2. The property is legally described as the Northeast ¼ of the Northeast ¼ of Section 17, Township 24 South, Range 17 East, lying and being in Pasco County, Florida.

further testified that the Debtor only paid off $8,000.00 of the principal before becoming delinquent, and that Alford, Sr.'s spouse, Nadine Alford, ("N. Alford") paid off the remaining $42,000.00. In 2002, prior to the execution of the mortgage in favor of Synovus, the Hudson Property was owned free and clear. In 2004, in a string of email communications between the Debtor and N. Alford, the Debtor agreed to execute a new deed for the Hudson Property that would reflect an ownership interest by N. Alford. (Def.'s Ex. 29.) However, no new deed was executed.

In 2002, the Debtor was the president of Mercury Technology Services, Inc., a Florida corporation ("MTS"). In early 2002, MTS applied to United Bank and Trust Company, the predecessor in interest to Synovus (also, "Synovus"), regarding the possibility of obtaining a business loan. As part of the loan application process, the Debtor delivered a personal financial statement to Synovus on February 2, 2002, which listed the Hudson Property and assigned it a value of $200,000.00 (Def.'s Ex. 1). A commitment letter was issued and signed by Synovus on February 6, 2002, and was subsequently signed and accepted by the Debtor both as guarantor and on behalf of MTS (Def.'s Ex. 3) ("Commitment Letter"). The Commitment Letter listed, among the items to be assigned as collateral for the loan, the following: "[a]ssignment of ½ interest in real estate and all improvements located in Hudson, Fl.; assignment of rents and leases." (Def.'s Ex. 3, 1.) However, the commitment was "subject to the following terms and conditions: 1. Execution of promissory note, security agreement, mortgage, assignments and guarantees in form acceptable to the Bank. . . ." (*Id.* at 2.) The Commitment Letter also included the following paragraph: "The terms and conditions as stated in this commitment letter shall survive the closing of the loan, and together with documents signed at closing, constitute our ongoing borrowing arrangement." (*Id.* at 3.)

The loan was approved by the United States Small Business Administration, and Synovus and MTS executed the loan documents in August 2002. The loan documents included, in part, the following: (1) a United States Small Business Administration Note executed by MTS and dated August 20, 2002 (Pl.'s Ex. 8) ("SBA Note"), (2) an Unconditional Guarantee collateralized by the Hudson Property and a life insurance policy, executed by the Debtor (Def.'s Ex. 9) ("Guarantee"), (3) a Mortgage on the Hudson Property, executed by the Debtor and Alford, Sr., limited on its face to $100,000.00 (Pl.'s Ex. 7) ("Mortgage"), and (4) a Hypothecation Agreement relating to the Hudson Property, executed by the Debtor and Alford, Sr. (Pl.'s Ex. 6) ("Hypothecation Agreement"). These documents, along with various other unrelated agreements, constituted the loan transaction between MTS, the Debtor, Alford, Sr., other unrelated parties, and Synovus. ("Loan Documents").

The Mortgage is a type-written form document. Blanks throughout the form are filled in by either hand-written or type-written words, in at least two distinct fonts that the Court can identify. For example, the dates throughout the document were entered by hand, but the month and year were type-written into the form. On the first page of the mortgage in all-capital letters is the following text:

> THIS MORTGAGE SECURES A PROMISSORY NOTE IN THE AMOUNT OF $270,000.00; HOWEVER, THIS MORTGAGE IS LIMITED TO $100,000.00 AND INTANGIBLE TAXES IN THE AMOUNT OF $200.00 ONLY ARE AFFIXED HERETO.

**128**

(Pl.'s Ex. 7, 1). This text was clearly not part of the form mortgage document, and the document itself is unhelpful for determining when and by whom this language was added. As both parties note in their papers, because the value of the Hudson Property in 2002 was estimated at $200,000.00, a mortgage of $100,000.00 would be a mortgage of the debtor's one-half interest in the Hudson Property based on its value at the time of the transaction.

The Hypothecation Agreement was executed contemporaneously with the mortgage, and states, in relevant part,

> In order to induce Bank to make or extend loans, advances or other financial accommodations to [MTS] (the "Borrower"), and in consideration thereof, we hereby consent and agree that the property described in Exhibit "A" hereto (the "Property"), of which we are the owner, may be and is hereby mortgaged and pledged to Bank as collateral, and Bank is hereby granted a mortgage and security interest in the Property for and *to secure any and all obligations and liabilities of the Borrower to Bank,* whether now existing or hereafter arising, direct or contingent, due or to become due, and any extension or renewal thereof, upon any terms and conditions whatsoever (collectively, the "Liabilities") and with the same force and effect as if the Property were owned by Borrower and mortgaged and pledged to Bank. *A separate mortgage is being executed to Bank in furtherance hereof* (the "Mortgage").

(Pl.'s Ex. 6, 1 (emphasis added).) Exhibit "A" attached to the Hypothecation Agreement includes merely the legal description of the Property, with no limitation of any sort given. The Guarantee executed by the Debtor also, below the signature block, lists the collateral securing the guarantee as follows:

> The "Undersigned" ... has mortgaged, granted a security interest in, pledged, assigned, transferred and/or delivered to Lender an interest in, among other things: (1) certain real estate ... *by virtue of a first mortgage* given by the Undersigned to Lender on or about even date herewith; ....

(Def.'s Ex. 9 (emphasis added).) Like the Hypothecation Agreement, the Guarantee does not give any sort of limitation to the mortgage on the Hudson Property. The only other collateral listed in the Guarantee is a life insurance policy on the Debtor.

At trial, the Court received the testimony of two Synovus employees regarding the MTS loan, but neither witness had been in any way involved with the preparation and execution of the Loan Documents. At trial, Denise Unley, a senior vice president of Synovus, testified that she was involved in the loan *application* process, in January and February 2002, and in the collection efforts after the loan went into default, but also testified that she had no involvement whatsoever with the drafting or execution of the Loan Documents. (Trial Tr. vol. 2, 202:8–203:12). She gave extensive testimony regarding the Bank's position during the collection efforts in 2004 and 2005, but did not speak as to the Bank's intent at the time of the execution of the Loan Documents.

The head of Synovus' United States Small Business Administration Loan Department, Lynn Johler, also testified regarding her involvement in the transaction, stating that her role was to "make sure we have all the proper approvals and then I'll pass it along to our closing division," which happened sometime in February 2002. (Trial Tr. vol. 2, 151:15–152:2.) Her only other involvement in the loan process after February 2002 was to approve the change in dollar amount of the loan, from $280,000.00 to $270,000.00.

(Trial Tr. vol. 2, 152:3–22.) She was not involved with or present at the closing, which was handled by the closing department, or the preparation of the loan documents, which were prepared, on behalf of Synovus, by the law firm of Holland & Knight, LLP. (Trial Tr. vol. 2, 151:15–20, 152:23–153:1, 156:20–21, 158:11–13.) Ms. Johler also testified that she was not aware of anyone from the closing department of Synovus ever objecting to the $100,000.00 limitation on the mortgage. (Trial Tr. vol. 2, 158:6–10.)

The only witness at trial who was involved in the preparation and execution of the loan documents was the Debtor himself, who testified explicitly that he did not intend to give Synovus a mortgage in excess of $100,000.00. (Trial Tr. vol. 1, 124:23–125:1.) The Debtor testified that he and Synovus had agreed to secure the payment of the SBA Note with the following: "receivables of the company, inventory of the company, assets of the company and a personal guarantor (sic), plus $100,000.00 tied to the 40 acres." (Trial Tr. vol. 1, 91:21–25.) The Debtor testified that he recalled reading the language limiting the Mortgage to $100,000.00, and that he did not believe he would have signed the Mortgage had it not contained that language. (Trial Tr. vol. 1, 49:1–7.)

The Debtor also testified that he did not add the language to the Mortgage document limiting the mortgage to $100,000.00 and that he did not know who did. (Trial Tr. vol. 1, 102:3–104:14, 125:2–126:14.) He testified that the Loan Documents were prepared by Holland & Knight, LLP on behalf of Synovus prior to the closing, that the closing took place at Holland & Knight's offices, and that he did not have any means by which to add the type-written words to the Mortgage at the closing. (*Id.*) He also testified that he was present when Alford, Sr. signed the Loan Documents, which he believed occurred at the Debtor's office prior to the closing, and that he did not believe that Alford, Sr. added the language to the Loan Documents. (*Id.*)

In 2004, MTS started experiencing financial difficulties, and became unable to maintain its payments under the SBA Note. The Debtor testified that due to a downturn in the technology industry and the subsequent flooding of the market with computers and used equipment, MTS received less than $10,000.00 for the sale of its entire inventory sometime around August or September 2004. (Trial Tr. vol. 1, 52:11–53:10, 96:4–97:8.) Pursuant to the list of assets attached to the SBA Security Agreement, the business assets of MTS had been given a resale value of $366,717.90 in August 2002. (Def.'s Ex. 8.) According to the testimony of the Debtor, all of the proceeds from the sale of the business assets went to Synovus as payments on the SBA Note. (Trial Tr. vol. 1, 54:9–21.) MTS ceased operations in 2004. (Trial Tr. vol. 1, 53:20–54:7.) When Synovus learned that MTS had ceased operations and sold all its assets, it negotiated a first and then a second payment agreement with the Debtor (Def.'s Ex. 14; Def.'s Ex. 17). Under the terms of the two payment agreements, Synovus agreed to defer payments on the SBA Note and agreed to "work with the borrower to allow the orderly sale of the real estate held as collateral. . . ." (Def.'s Ex. 14, 1; Def.'s Ex. 17, 1.) Neither payment agreement involved the execution of a new or altered mortgage on the Hudson Property.

In 2005, Alford, Sr. and the Debtor found a purchaser for the Hudson Property and entered into a contract to sell for $410,000.00. (Trial Tr. vol. 1, 54:22–55:10.) On or about May 31, 2005, Alford, Sr. filed a lawsuit to partition the Hudson Property, claiming a 92% interest in the property.

(Def.'s Ex. 28.) Synovus intervened to enforce its mortgage on the Hudson Property. Synovus, Alford, Sr., and the Debtor mediated their dispute, which resulted in the signing of a Mediation Agreement on June 20, 2005 (Pl.'s Ex. 13). Pursuant to the Mediation Agreement, the parties agreed that the Hudson Property would be sold for $410,000.00, that the Synovus Mortgage would be satisfied from the Debtor's share of the proceeds, and that Alford, Sr., would be granted an additional $10,000.00 from the Debtor's share of the proceeds. (*Id.* at 3.)

Plaintiff's Exhibit 21 is a short internal Synovus credit memorandum dated June 23, 2005, authored by Ms. Unley (Pl.'s Ex. 21). The final paragraph of the memorandum read as follows:

> I inquired of Harold if we should go ahead and charge off the remaining $103m (sic) balance now, as the $100m (sic) limitation on the mortgage may affect our guaranty. Harold's preference was to wait, as our collateral was ½ interest in the real estate, which was valued at $200m (sic) at that time. The limitation was to protect the dad's ½ interest in the proceeds. Dale has indicated all along that we would receive his full ½ of any proceeds.

(*Id.* at 1.)

In August, the Debtor requested a payoff amount on the Mortgage from Synovus. Synovus responded on August 11, 2005, demanding approximately $180,000.00 as the amount due to satisfy the Mortgage. (Pl.'s Ex. 14.) Synovus filed a lis pendens action on August 19, 2005 (Def.'s Ex. 21), which it dismissed voluntarily when the Debtor agreed to the terms of disbursement (Def.'s Ex. 23; Def.'s Ex. 24). According to the testimony of the Debtor, he only learned during the closing on the Hudson Property in August that Synovus was seeking more than $100,000.00, but he agreed to pay the demanded amount to allow the sale to close, because he was afraid of losing the sale or being sued by the potential buyer. (Trial Tr. vol. 1, 61:6–62:8.)

*Conclusions of Law*

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(a). Venue is proper pursuant to 28 U.S.C. § 1409(a). This is a core proceeding to determine, avoid, or recover a preference under 28 U.S.C. § 157(b)(2)(F).

Under 11 U.S.C. § 547(b), a trustee may avoid a "transfer of an interest of the debtor in property" to a creditor on account of antecedent debt that is made within 90 days of the filing of the petition, if it would enable the creditor to receive more than it would have received in a case under Chapter 7 had the transfer not been made. None of the various exceptions to this provision are applicable in this case. *See* § 547(c). If Synovus held a mortgage in all of the Debtor's interest in the Hudson Property, the transfer would not be a preference under § 547(b), because Synovus would have had a security interest in the proceeds of the sale and would not have received any less in a case under Chapter 7. However, if Synovus was only secured up to $100,000.00, then any transfer of the Debtor's share of the proceeds above that amount would be in satisfaction of an unsecured debt and, therefore, an avoidable preference.

The Trustee's position is clear. The Debtor, according to the deed, owned the Hudson Property as tenants in common with Alford, Sr. Because the deed is silent, as supported by the actions and statements of the parties, it is clear that the Debtor had a one-half interest in the Hudson Property. *See Julia v. Russo*, 984 So.2d 1283, 1285 (Fla. 4th DCA 2008) (quoting *In re Levy*, 185 B.R. 378, 381 (Bankr.S.D.Fla.1995)) ("In absence of evi-

dence to the contrary, co-tenants are presumed to [own] equal undivided interests"). Synovus held a mortgage on the Hudson Property, limited on its face to $100,000.00, but, upon the sale of the property within 90 days of filing, Synovus received $70,863.10 above that amount. Under the Loan Documents, the Debtor was personally liable to Synovus for the business debts of MTS; however, those obligations were not secured. Therefore, the transfer of the $70,863.10 to Synovus is an avoidable transfer, made on account of antecedent debt within 90 days of the filing. While there may be some ambiguity in the Loan Documents, it is clear that the mortgage was limited to $100,000.00, and was intended by the parties to be so limited.

Synovus, in defense, has raised three separate theories to upset the Trustee's case, which the Court will consider in turn. First, at trial Synovus introduced the argument that the Debtor did not have a one-half interest in the Hudson Property at the time of the mediation and sale. Synovus asserts that the Debtor only had a 10% interest in the Hudson Property at the time of the sale. If this were so, there could be no avoidable transfer in any amount in excess of that 10%, because it would not be a transfer of the Debtor's interest but rather of Alford, Sr.'s interest in property. As such, the transfer of the $70,863.10 would not be an avoidable transfer regardless of whether the mortgage was limited to $100,000.00.

■■■ Under Florida case law, when a person's name appears on a title to property, a rebuttable presumption arises that the person has a beneficial interest in the property. *In re Lezdey*, 373 B.R. 164, 168 (Bankr.M.D.Fla.2007). Florida case law also supports a presumption that tenants in common hold equal undivided interests. *Julia*, 984 So.2d at 1285; *see also In re Lezdey*, 373 B.R. at 167 (citing *O'Donnell*

*v. Marks*, 823 So.2d 197 (Fla. 4th DCA 2002)). Co-tenants are generally liable for their proportionate share of the expenses and obligations related to the property. *Biondo v. Powers*, 743 So.2d 161, 164 (Fla. 4th DCA 1999). However, where one co-tenant pays a greater percentage of expenditures, including mortgage payments, the result is not an increase in that co-tenant's equity in the property, but rather an entitlement to contribution. *Id.* (citing *Singer v. Singer*, 342 So.2d 861 (Fla. 1st DCA 1977) and *Waskin v. Waskin*, 346 So.2d 1060 (Fla. 3d DCA 1977)).

■■■ In 1993, Alford, Sr. transferred title of the Hudson Property to himself and the Debtor as tenants in common. The deed is silent as to the division of ownership. According to the testimony of Alford, Sr., his understanding of the transaction was that the Debtor would pay off the mortgage, which amounted to $50,000.00, in exchange for having his name put on the deed. Alford, Sr. testified that because "[t]he property value at that time far exceeded $100,000.00" this arrangement benefited both himself and the Debtor. This testimony supports rather than rebuts the presumptions of equal ownership and beneficial interest. Alford, Sr, argued from the witness stand that the Debtor's ownership interest in the property decreased due to his failure to pay off the $50,000.00 mortgage. However, under Florida law, this does not change the amount of equity the Debtor owned in the property. *Biondo*, 743 So.2d at 164; *see also In re Latini*, 334 B.R. 338, 342–43 (Bankr.D.Mass.2005) (applying Florida law and holding that a creditor's claim for contribution did not attach as a lien to the proceeds of the sale of the co-tenant property and was not entitled to priority over other claims in the case). Therefore, it is this Court's conclusion that the Debtor had, at all relevant

times up to the time of the sale, a one-half interest in the Hudson Property.

■ The second argument asserted by Synovus is that the Loan Documents, taken as a whole, give Synovus a security interest in the Debtor's one-half interest in the Hudson Property. Synovus argues that because the transaction as a whole is ambiguous, the entirety of the transaction must be examined to determine the intent of the parties at the time, and the Court must give effect to that intent. Because the intent at the time of the transaction, Synovus argues, was for Synovus to receive a mortgage secured by the Debtor's one-half interest in the Hudson Property, not merely a mortgage limited to $100,000.00, then the Court should alter the mortgage to give effect to that intent. Fully secured, Synovus received no preferential transfer.

■ Where multiple documents are executed together as part of a single transaction, "they are to be read and construed together." *KRC Enterprises, Inc. v. Soderquist*, 553 So.2d 760, 761 (Fla. 2d DCA 1989). Additionally, "the primary rule of construction of a mortgage is to ascertain the intention of the parties." *Huntington Nat'l Bank v. Merrill Lynch Credit Corp.*, 779 So.2d 396, 398 (Fla. 2d DCA 2000) (citation omitted). Where several instruments "are executed contemporaneously with a mortgage and are part of the same transaction, a mortgage may be modified by other instruments and all the documents are read together to determine and give effect to the intention of the parties." *Boyette v. Carden*, 347 So.2d 759, 761 (Fla. 1st DCA 1977); *see also Sardon Found. v. New Horizons Service Dogs, Inc.*, 852 So.2d 416, 420 (Fla. 5th DCA 2003). Therefore, in this case, the transaction consummated in the Loan Documents must be construed as a whole.

■ It is a general rule of contract interpretation that parol evidence "is not admissible to vary, contradict, or defeat the terms of a complete and unambiguous written instrument." *Fla. Moss Products Co. v. City of Leesburg*, 93 Fla. 656, 112 So. 572, 573 (1927). The parol evidence rule allows for only very narrow exceptions. Synovus has argued that in this case, one of these exceptions is applicable, namely, that "extrinsic evidence" may be considered "[i]f a written contract is ambiguous or obscure in its terms, so that the contractual intention of the parties cannot be understood from a mere inspection of the instrument...." *Jacobs v. Parodi*, 50 Fla. 541, 39 So. 833, 837 (1905). Here, the Loan Documents must be interpreted as a whole. It is the law of this case, pursuant to prior published opinion, that, given the difference in the language on the face of the Mortgage and language in the Hypothecation Agreement, the Loan Documents taken as a whole are ambiguous. *In re Alford*, 381 B.R. 336, 341 (Bankr.M.D.Fla. 2007) (Glenn, C.J.).

■ The ambiguous transaction exception does not entirely eliminate the parol evidence rule. One of the earliest parol evidence cases in Florida makes clear that even where an exception applies, parol evidence must still be "consistent with, and not contrary to, such written instrument." *Fla. Moss Products*, 112 So. at 574. More to the point,

> It is not permissible, under the guise of proving by parol the consideration of a written contract, to add to or take away from the other provisions of the written instrument, nor to modify, impair, or destroy the operative effect thereof. If the rule were otherwise, the obvious result would be to abrogate the long-settled rule respecting the finality of written contracts.

*Id.* The parol evidence is permitted only to clarify the identified ambiguity. This rule accords with other exceptions to the parol evidence rule. For example, where the expression of consideration in a contract is not complete, for example, by listing "One Dollar and other valuable considerations," then parol evidence may be "received to determine the correctness of the consideration." *McComb v. Hygeia Coca–Cola Bottling Works Inc.*, 137 Fla. 260, 188 So. 219, 222 (1939). However, "a party cannot, either in law or equity, contradict or vary terms of his written unambiguous contract" based on parol evidence. *Id.; accord Jackson v. Parker*, 153 Fla. 622, 15 So.2d 451, 459 (1943). Parol evidence may be used to show the "true or real consideration ... *provided it is not inconsistent*" with what is provided in the contract. *Mallard v. Ewing*, 121 Fla. 654, 164 So. 674, 678 (1935) (emphasis added). In the context of applying the inducement exception to the parol evidence rule, the Eleventh Circuit has affirmed the interpretation of Florida law that "parol evidence *may not directly contradict* a contemporaneous written agreement ...." *Ungerleider v. Gordon*, 214 F.3d 1279, 1284 (11th Cir.2000) (emphasis added) (noting that extrinsic evidence is certainly not permissible where it would be "not only inconsistent with, but repugnant to, other plain terms of the instrument").

This Court previously identified the ambiguity on summary judgment as arising from the language in the Mortgage providing that it is "limited to $100,000.00 and intangible taxes" and the absence of any such limiting language in the Hypothecation Agreement, which instead provides that the mortgage is to "secure any and all obligations and liabilities of the Borrower (MTS) to the Bank." *In re Alford*, 381 B.R. at 341. To address this ambiguity, the Court may consider parol evidence to determine the intent of the parties at the time of the transaction.

■ Synovus has rightly pointed out that a court may consider the parties' course of dealings in order to determine the meaning of the ambiguous contractual provisions. *See Sardon Found.*, 852 So.2d at 420 (If ambiguous, the court is to consider "parol evidence, including the conduct of the parties in their course of dealings...."); *Brevard Co. Fair Ass'n, Inc. v. Cocoa Expo, Inc.*, 832 So.2d 147, 151–52 (Fla. 5th DCA 2002) ("Courts often look to the conduct of the parties in their course of dealings to determine the meaning of a contract."). However, in this case, the parties' dealings after the execution of the Loan Documents are not helpful in determining the intent of the parties as to the nature and extent of the Mortgage at the time of its execution. In *Brevard*, for example, the Court looked to the parties' course of dealing during the lease term to determine the meaning of an ambiguous lease provision. 832 So.2d at 152. There are no analogous dealings between these parties that could assist the court in determining whether the parties intended that the mortgage executed in 2002 be limited to $100,000.00 or attach to the Debtor's one-half interest in the Hudson Property. While there were negotiations between the parties and new payment agreements executed, no new mortgage was ever executed, and such negotiations cannot properly be considered as a "course of dealings" that could be used to clarify this particular ambiguity.

At trial, Synovus introduced the testimony of several Synovus employees who were involved with the MTS transaction; however, none of these witnesses were at all involved in the negotiation and execution of the Loan Documents themselves. The only witness to testify as to the intent of the parties at the time of the execution of

the Loan Documents was the Debtor. The Debtor unequivocally stated that his intention in 2002 was to give Synovus a mortgage in the limited amount of $100,000.00, which represented, at that time, his one-half interest in the Hudson Property. It was his understanding that any increase in equity would be to his benefit, and would not be secured by the Mortgage granted to Synovus in 2002. Considering the totality of the circumstances of the transaction and the uncontroverted testimony of the Debtor, the Court concludes that the intent of the parties was that the mortgage should be limited to $100,000.00.

Not only is this interpretation supported by the evidence presented of the parties' intent at the time of the execution of the Mortgage, it comports with other principles of contractual interpretation. The relevant language in the Hypothecation Agreement states that Synovus "is hereby granted a mortgage and security interest in the Property for and to secure any and all obligations and liabilities of [MTS] to [Synovus], whether now existing or hereafter arising.... A separate mortgage is being executed to [Synovus] in furtherance hereof." (Hypothecation Agreement, Pl.'s Ex. 6, p. 1.) The language indicating that the mortgage is "to secure any and all obligations and liabilities ... whether now existing or hereafter arising" is what is commonly called a "dragnet clause." Boyette, 347 So.2d at 761. A dragnet clause makes a mortgage security for all amounts due at the time of its execution and for all sums due in the future; therefore, Florida law dictates that such clauses "should be strictly construed against the party preparing the instrument," which in this case is Synovus. Id. Strictly construed, this language merely makes the security granted to Synovus in the form of the Mortgage liable for all debts ever owed by MTS to Synovus. It

does not, strictly construed, alter the terms of the Mortgage to grant security in something more than what the Mortgage provides.

The final argument Synovus has raised to defeat the Trustee's claim is that, even if they fail in all other arguments, this Court should grant Synovus an equitable lien on the proceeds of the sale of the property. Under long-settled Florida law, an equitable lien arises from two sources:

(1) A written contract which shows an intention to charge some particular property with a debt or obligation; (2) is declared by a court of equity out of general consideration of right and justice as applied to the relations of the parties and the particular circumstances of their dealings in the particular case.

Jones v. Carpenter, 90 Fla. 407, 106 So. 127, 129 (1925); see also Ross v. Gerung, 69 So.2d 650 (Fla.1954). Synovus argues that it is entitled to an equitable lien first because the Hypothecation Agreement demonstrates the parties' intent to charge the whole of the Hudson Property with the entire debt owed by MTS to Synovus. Secondly, Synovus argues that it is also entitled to an equitable lien on the proceeds of the sale because of the bad acts of the Debtor in the context of the liquidation of the assets of MTS, namely, that the Debtor liquidated all of the assets of MTS for a fraction of the prior appraised value, without the consent or knowledge of Synovus in violation of the Loan Documents.

Equitable liens are, by definition, created in equity. They are used "to remedy those situations where ... there is either an absence of an available lien or no adequate remedy at law." In re Bob Cooper, Inc., 65 B.R. 609, 612 (Bankr.M.D.Fla. 1986). In this case, Synovus has made much of the fact that when the business assets of MTS were liquidated, the proceeds were a mere fraction of the value

assigned to them in 2002. However, bankruptcy courts are particularly familiar with the notion that the forced sale price of assets may be significantly lower than the fair market value or even an orderly liquidation value, especially in a depressed market. *See, e.g., In re Neff,* 60 B.R. 448, 453 (Bankr.N.D.Tex.1985). The Debtor's testimony that the market for used computer equipment fell substantially after 2002 is credible and was not seriously controverted by Synovus. To impose an equitable lien based on "general consideration of right and justice" generally "requires some equitable basis supporting a court's equitable jurisdiction such as fraud, mutual mistake, estoppel or reprehensible conduct." *First Union Nat'l Bank of Fla. v. Diamond (In re Diamond),* 196 B.R. 635, 639 (Bankr.S.D.Fla.1996). The debtor's failure to inform Synovus prior to the liquidation of the business assets of MTS, in violation of the Loan Documents, does not rise to the level of "reprehensible conduct" that would invoke this Court's equity jurisdiction.

Examining as a whole the relations between these parties and the circumstances of this case, it is clear that the overall equities do not support granting Synovus a lien on the proceeds of the sale in excess of $100,000.00. The testimony and evidence presented at trial indicates that the Loan Documents, including the Mortgage limited in amount to $100,000.00, were drawn up under the direction of Synovus. If Synovus now wishes that the Mortgage were not so limited, Synovus has none to blame but itself.

■■■■ Synovus also argues that it is entitled to an equitable lien under the theory that the Hypothecation Agreement is a "written contract which shows an intention to charge some particular property with a debt or obligation." *Jones,* 106 So. at 129. This argument must also fail. An equitable lien may only be imposed under this prong where "the intention to offer the land as security for the debt is clearly apparent." *Hansen v. Five Points Guaranty Bank,* 362 So.2d 962, 964 (Fla. 1st DCA 1978); *see also Ness Racquet Club, LLC v. Renzi Holdings, Inc.,* 959 So.2d 758, 761 (Fla. 3d DCA 2007). As noted in the above discussion of the intention of the parties with regards to the Loan Documents, it is not "clearly apparent" that the intention of the parties was to charge the Hudson Property with a mortgage in excess of $100,000.00 through the execution of the Hypothecation Agreement.

■■■■ Even if this Court had determined that Synovus was entitled to an equitable lien under any of these theories, it is also clear that such equitable lien would amount to an unrecorded mortgage that would likewise be subject to avoidance by the Trustee. *See In re Bridge,* 18 F.3d 195, 204 (3d Cir.1994) (applying New Jersey law); *In re Tsiolas,* 236 B.R. 85, 89 (Bankr.M.D.Fla.1999); *Weissing v. Gerring (In re G & R Builders, Inc.),* 123 B.R. 654, 660 (Bankr.M.D.Fla.1990); *In re Bob Cooper,* 65 B.R. at 613. While there was notice of a mortgage on the Hudson Property in the public books and records, that recorded mortgage was specifically limited to $100,000.00.

None of the three defenses raised by Synovus are able to defeat the Trustee's claim for avoidance of a preferential transfer. Therefore, judgment must be entered in favor of the Plaintiff. The Trustee is entitled to recover $70,863.10 from Synovus as a preferential transfer under 11 U.S.C. § 547. A separate final judgment will be entered in accordance with this opinion.

### FINAL JUDGMENT

THIS PROCEEDING came on for consideration upon the entry of the Court's

Findings of Fact and Conclusions of Law. Based on the Findings of Fact and Conclusions of Law, it is hereby

**ORDERED:**

1. Judgment is entered for the Plaintiff against the Defendant, Synovus Bank of Tampa Bay, on Count I of the Complaint.

2. Susan K. Woodard, as Chapter 7 Trustee for the estate of Dale Alford, Jr. and Terri Ann Alford, shall recover the sum of $70,863.10, against Synovus Bank of Tampa Bay, 32845 U.S. Highway 19, Palm Harbor, Florida 34684, for which let execution issue forthwith.

3. The Clerk is directed to close this Adversary Proceeding and to terminate any pending motions as moot.